Let's let everyone just get settled for a minute. All right, Mr. Estrada. Thank you, Judge Smith, and may it please the Court. This morning I would like to focus on two issues. The district court's decision to take Aetna's billing fraud and misrepresentation case away from the jury after a 13-day trial, and the exclusion of the evidence and argument on the question of kickbacks. On the billing fraud question, I think the other side tends to obscure two fundamental facts that I think are key to the case. The first one is that North Cyprus was an out-of-network hospital that had no right to submit a bill to Aetna other than by obtaining an assignment for patients and standing in the shoes of the patient. They had unsuccessfully sought to be in that hospital, right? Correct. And so they could only submit bills by obtaining an assignment from the patient, and that the evidence showed, even from their own witnesses, that when patients came to North Cyprus, they were never quoted a charge master price. They were consistently quoted a charge that was intended to reflect in-network rates that they would have received at other hospitals, and that was calculated by North Cyprus based on 125% of Medicare. In other words, the patients were lured to the hospital on the basis of a low price, 125% of Medicare, and a bill was submitted to Aetna on the basis of a much larger price, the so-called charge master price. Just as a patient could not pay the bill for X and turn around and send the bill to the insurance company for 10X, the hospital cannot do the same without committing fraud. Just to give you a concrete example of this from the briefs, patient VS came to the hospital for a kidney stone process. The charge master for that, as billed to Aetna, was $28,700 and change. The payment that he or she would have been required to make would have been $7,600. The patient never heard $28,700, was never asked to pay $7,000 or anything close to that $7,600. The only number that the patient heard was the Medicare 125% number, $4,500, and of that she was asked to pay $1,200 and change. But the bill sent to Aetna was $28,000 and change. And this happened, according to the record, 44,000 times. Now, in our view, when they sent a form to an insurance company claiming that the charge for the procedure had been something that the patient never heard of, was never charged, that is fraud. And I think the Huntington case recognizes that. One of the remarkable things about this case, it seems to me, from your point of view is that, correct me if I'm wrong from the record here, but Aetna continued to approve all of these claims, tens of thousands of them, without a challenge. Well, let me get to that because I think that now we get to a separate part of the scheme, which is the so-called prompt pay discount. We started separate investigations into these charges in 2007, 2008, and 2009, I believe, and all of these things are in the record. And each time that we inquired, we were expressly assured in 2007 by a letter from counsel. In 2008, they gave us the runaround and would not answer calls. And ultimately, Glenda Tankersley, who was one of their managers, expressly assured us that all that was going on was a prompt pay to a short settlement of accounts and not anything like a waiver of co-pays. So all this time, we kept paying because we had no basis on which to refuse payment. We tried to investigate. We sent surveys to patients. But as we pointed out on the basis of the record, the evidence turned out to be inconclusive. Now, you hear a lot of arguments, Judge Smith, and you probably don't recall the last time I was in front of you, but, you know, the fact is actually I think Judge Winner was also on my panel. It was another one of these cases in which the issue was another hospital and another insurance case involving a state statute in which insurance companies get sued for not promptly paying claims that are so-called clean. And so we also have a lot of law and regulatory structures which basically say if you have no basis on which not to pay, you have to pay promptly. And if you have a claim that is presented for services actually rendered, you might think, well, this is something fishy about this, but unless I have a basis for which actually not to pay it, I've got to pay it. That's point one. Point two is you might think the claim is too high and you might cut it on that basis, but what happens in those circumstances is that the member, that is, the patient, is balance billed for what the company has not paid. And in many of these cases, what Aetna and other insurers are trying to do in trying to investigate while paying is trying to shield the patient from getting these massive bills that the insurance company hasn't paid. And so, yes, it is true that there were payments along the way while Aetna tried to investigate, but there were good reasons for it. I mean, we have to have a good reason not to pay, and if we refuse payment or cut payments, there's a high risk that the member will be balance billed. One of the reasons from some of the years at issue here, while we agreed to pay their claims under the multi-plan network, is because the multi-plan network, one of the features is the member cannot be balance billed. And so one of the things that the company had in mind in continuing to investigate these issues was we have to safeguard the member. But importantly here, what's really at issue is patients came, they never heard a charge master number. The record is absolutely clear on that, and we always got a bill for the charge master account. Now, they can say this is their market rate and all of that, and it's a rack rate, maybe. I could go to the Winsor Court Hotel, and it could well be that their rack rate is $300 a night. And if I get my AAA card out, they'll give me a discount to $250. If I send a bill to my law firm for $300, that may be their rack rate, but I'm engaging in a fraud on my law firm. And if I have the hotels and the firm to them, they're also engaged in a fraud, and this is no different. Now, to the prompt pay issue, there is no question that the amounts at issue could not be justified by a prompt pay moniker. They say that they modeled this on a federal program of prompt pay discounts. One of the most telling aspects of this case is that although they use the same forms that are used for the federal government and are used for every payer, and they claim to have modeled their prompt pay discount on advisories by the federal government, they had expressed instructions not to apply this prompt pay policy of discounts to any federal payer. They knew well enough that the one thing to avoid in the application of this policy was orange jumpsuits, and it was a very clear indication that they knew what they were doing. Now, the district court looked at all of this evidence, and he was persuaded by two things that I think were sort of in error. The first one was this is their rack rate, which, as I said earlier, it may well be, and if they actually charged it, we would have other issues with it, but that would be a different type of case. But the evidence was, and we were entitled to argue to the jury, that the patients were charged X, and they were sending us bills for 10X. Now, the second thing, and this was the key aspect of his ruling as to why we could not go to the jury, this is, I believe, at the top of page 1, 2, 3, 7, 5 of the record on appeal. He said, the resolution of Edna's claim for fraud rests on whether the UB404 claim forms and related documents establish that North Cyprus fraudulently manipulated patient diagnoses. In other words, the district court thought that unless the patients were not sick, there were no fraud. That's not the type of fraud that we were alleging. We were not claiming that they were sending in claims from people that were not sick. We were claiming that people had the illnesses for which they were treated, but they were submitting claims that were far in excess of the charges that they were actually charging the patient. That was the fraud that we were alleging, and we had plenty of evidence for that. We also have plenty of evidence that they had concocted the prompt pay moniker as a cover-up for this, that the prompt pay could not reasonably justify what they were doing, that they knew it. And we had, in fact, additional evidence that the district court excluded, to which I would now like to turn this question of the kickbacks. As we point out in our papers, Houston is a big city that is very lucky to have world-class medical facilities, many of which are in Edna's network. And so it would be very difficult for an upstart medical facility like North Cyprus to get patient influx with the type of world-class medical facilities already available in network. And as we claimed in our case, and we had the evidence in our offer of proof to back up, what North Cyprus did was to go to doctors that were under contract with Edna and offer them ownership interests to refer patients to North Cyprus. And the more they sent patients to North Cyprus, the more they became rich and able to partake in the benefits of ownership in North Cyprus. That was our offer of proof. It was key, in our view, to our ability to further demonstrate this fraud, that we be allowed to show that this had been coolly crafted from the outset, that there had been a careful planning given to the fact that people were corrupted, and that not only the patients had to be persuaded to abandon the other many excellent options that were available to them in the Houston market in network by telling them that the price would be the same as if they were in network in those facilities, but their doctors had to be persuaded to send them there by being given ownership interests here. That obviously, as we point out in our papers, is a violation of federal and state law. It would be highly relevant to a jury to understand that what was going on here was not merely a question of paperwork accidents, but something that had been established from the outset as a very carefully orchestrated scheme to get the patients in the door with the complicity of the doctors who agreed to send them there, then to persuade reluctant doctors, excuse me, patients, that they would pay no more than if they were at these other in-network facilities, and then turn around and bill the insurance companies these much higher out-of-network rates while telling them all along that all that was going on was that the patients were getting a discount for the time value of money. All of this evidence was on the record. From all of this evidence, as we know from Huntington and the Third Circuit, and now from your own Humboldt case, we could have gone to a jury, and a jury could have found that there was a good case for fraud. Now, let me say just one final thought on the question of damages. The district court, for good measure, thought that we had not put in a good case for damages, and North Cyprus tries to salvage what the district court said as best it can. If you read it, it's very difficult to make sense of what the reasons were that the district court gave for excluding the expert. The best that North Cyprus tries to say is that it was a Daubert exclusion. Daubert was not mentioned. Rule 702 was mentioned in passing. The essence of what the judge said was that the witness was biased, which of course would not be a basis for exclusion, and that he could not see how the testimony actually related to the terms of each of the plans. Now, I have two points to make about that. The first one is that the testimony was clearly connected to the testimony at the trial because the damages model was based in the difference, as provided by Texas law, between what we pay them and what we should have paid them. One of the models was the difference between 125% of Medicare and what we pay them. And so you don't need to consult the plans because it was uncontested and now confirmed by Humble that under the plans, we had no obligation to pay any more than the patient had to pay. And so if the patients had no obligation to pay any more than 125% of Medicare, we didn't have any obligation to pay that either. This is confirmed also by the Kennedy opinion by Judge Easterbrook in the Seventh Circuit. That's point one. And so if the testimony was that the patients were told 125% of Medicare, that was all that we needed to pay, and if we paid more, the difference was our damages. The second point was that even if you thought that she was not a good expert, this is not a question of expertise. This is a question of math, which was undisputed. And so the district court could believe that Edwards could not be qualified as an expert, and the testimony would still have to be admitted as lay expert, as lay testimony, because this is just a question of summing up the damages that we suffered based on the evidence that was already on the record. And for all of these reasons, I think that the judge was clearly in error in taking this case away from the jury. We ask that we be sent back to have our case in front of a jury, and that in so doing you make it clear that we should be free to introduce our evidence of kickbacks and argument relating to the same. Thank you so much. Thank you, Mr. Estrada. You've saved time for a rebuttal. Mr. Sutter. May it please the Court, Doug Sutter for North Cyprus Medical Center. This is a fact-intensive case. North Cyprus is a general acute care hospital, the largest one in northwest Houston, when it opened in 2007. And what I heard today is what happened throughout the entire trial. There is a huge distinction between what the bill charges are and what the patient responsibility, the patient responsibility, not the out-of-network provider to pay money is. And why this is fact-intensive and show that Judge Hoyt got it completely right, when North Cyprus began in 2006, it tried to go in-network with Aetna. Aetna refused to do it, saying, we don't need another hospital. They said, by the way, out-of-network members without in-network benefits will come to your hospital. We then had the prompt pay discount in which we never, ever advised any patient that the total charges would be the amount that the patient would pay in order to be eligible for the prompt pay discount. When the patient comes in and is advised of the prompt pay discount at the time of service, no one knows what the total charges are going to be. No one knows what the doctor is going to do. No one knows how the patient is going to perform. We advised Aetna in 27 over 2.3 years letters advising we had a prompt pay discount based upon the patient responsibility amount. Aetna immediately wrote back to us in January from Mr. Chulik, who is their regional counsel, and that's extremely important. Their legal department was involved from day one, advising us, thank you for this notice, and then providing to us an inapplicable Texas statute about waiver patient responsibility amounts. After that, the evidence continued to go out showing that we had a prompt pay discount and on every single UB04 claim form that we had, we advised Aetna when there was a prompt pay discount. So they knew on thousands of occasions we had a prompt pay discount. By March of 2008, by their own records, they knew that our prompt pay discount amount that we collected up front was based upon in-net work patient responsibility amounts. Again, in June of 2009, they write that they know that is the case. By this time, there are 10 departments investigating North Cyprus and 13 to 15 SIU members, the investigation department, fraud investigation department, and the legal department. By 2010, Aetna brings in outside legal counsel, Mr. John Shealy, who tried this case with me. And at that time, they received instructions to escalate, escalate, escalate, put every one of our claims under intense review. The notes then came back, said this is what we're going to do, every claim under intense review. Then Mr. King, who is the head of National Network, who's up in Connecticut, came back and said we will do this and we will bring North Cyprus down. Now, Judge Smith, you are right. This case is very unique because they continued to pay. Never one time did they ever deny coverage for any exclusion in any of the plans or policies or state that we are not going to provide any type of opinion or adjudicate your claims until you give us information. So the question comes down, why was Aetna doing this? Aetna also claims, you just heard, that our charges were exorbitant, which was also very odd because during this investigation period, we underwent charge master audits where they knew every single charge that we made for every CPT code by their own testimony. They also tracked every single one of our charges and put it in their database. And you have to ask, why did they do this? Why were they paying off bill charges when by their own testimony, they could have applied the usual customary rate at any time, which was anything Aetna wanted, whether it be a fee schedule, a percentage of Medicare, or just what they thought in that geographic area we should be charging. They never did it. Instead, they utilized the National Advantage Program, which counsel did not mention to you, that under their plans they were able to do. And why did they do that? Because if they paid us off bill charges and there was a discount, they participated 40 to 50 percent of that alleged savings. By one plan sponsor alone out of 600 plus, Harris County, they made $1.5 million in additional fees in just one year. They made tens of millions of dollars off of our bill charges. And how did they do this? From 2007 and in 2010, they had what they called ad hoc agreements. They literally sent us by fax from Aetna through Global Claim Service, a wholly owned subsidiary, on Aetna fax saying, will you agree to a 20 percent discount of bill charges? And it still says in that document, subject to deductible copay, and UCR can still be deducted. We said yes and we signed it. They then paid off that allowed amount off of our bill charges that they knew. Why? Because they got 40 to 50 percent, tens of millions of dollars in that amount. And then in 2010, when we went in with Multiplan, which was a third party wrapper network, asked us to join a 25 percent discount. We had no idea if Aetna would accommodate our claims or adjudicate our claims through Multiplan. But Multiplan asked us, we negotiated 25 percent. Aetna then stopped sending us the ad hoc agreements and started wholesale putting all of the claims through Multiplan, which their own expert witness said was inefficient claims handling. Instead of handling the claims themselves, that's where 40,000 of the 44,000 claims came. And again, why did they do that? Because they were going to get 40 to 50 percent of the savings. The administrative service agreements with the plan sponsor says it has to be an actual saving. What that means is below the UCR, whatever they can determine is. They didn't do that. They just took the money. Now, the other thing that is important, judges, they only sued on one half of their claims in the National Advantage programs, the ones that went through Multiplan. They did not sue on the 5,396 claims. It's really up to 7,000. The testimony was 5,396. If you look at the spreadsheets, it was over 7,000. They did not sue on that, even though they still claim the same fraud, the same kickbacks, the same exorbitant charges. Why? Because they negotiated directly with us on those contracts, which clearly nullified fraud. How do you have fraud when you negotiate and know what our bill charges are? And during this entire period of time, the plan sponsors started complaining because they thought the payments were too high. They were complaining to Aetna. And David Kessner from Harris County said at one point, we never got a good answer from Aetna. Why? They weren't simply applying UCR. Ms. Urschel, who is a manager of the SIU department, said all we had to do was apply SIU. I'm sorry, apply the UCR amount, which they never did. This investigation continued to 2010 all the way to 2013, six whole years. By 2010, they also involved their outside legal counsel, if you look at the evidence, gentlemen, involved their outside legal counsel in advising them how they should adjudicate our claims on private rooms. And this is very akin to the Texas law. I know Judge Willen knows this, the Italian partners cases that we have. When you have counsel involved, I know it's different because there is a negotiation of a contract and the no representation clause. And when you're represented by counsel through the entire period of time and you're a sophisticated party, don't come to the court and claim fraud. And by akin, those cases are very similar to this one because they had not only their legal counsel involved in-house during the entire period of time, but outside legal counsel who ended up trying this case. And the fact of the matter is, with regard to the patient responsibility amounts, the ASAs are very clear. That's the agreement they have with the plan sponsors. We are not to send our bills to the patients. When is the last time anybody here had insurance, went to a hospital and they got a bill? It goes to the insurance company first for coverage determination. They even say that we are not to collect the patient responsibility up front until the claim is adjudicated and Aetna issues an explanation of benefits to us. Then we can bill the patient. We never, there is no evidence whatsoever that the patient was ever told that the total charges that they would have would be the amount that they would be paying for the prompt pay discount. It just was not there, and Judge Hoyt saw that. The other thing with fraud is you have to have reliance. But this Court has said time and time again it has to be justifiable reliance. And under the facts of this case, they paid for six years, having dozens of people investigate, lawyers investigate, and even through trial, through 2016, they continued to pay. That's nine years. And I won't get into the issue of waiver in that situation, but this Court has also said in Harrelson, when you look at this justifiable reliance, you have to look at the characteristics, abilities, and appreciation of the facts at or before the alleged fraud. And it is extremely unlikely that there is actual reliance. There was no reliance whatsoever on the part of Aetna in this matter. Also, this Court has already ruled in North Cyprus v. Cigna on the identical prompt pay discount with the identical notices that went to Cigna, except I think there's 25 to Cigna, 27 to Aetna, that under this fact situation, fraud is particularly inapt. And, again, I know Judge Willis will recall in the voluntary payment rule under Texas law, when you pay claims voluntarily like this, you cannot come in and claim a reimbursement. And the fact is there was one no fraud and no reliance whatsoever. Now, the other thing that counsel talked about was the striking of the damages. And this was Ms. Edwards. And this was very interesting because, remember, judges, there were two trials here. We went almost two weeks with our ERISA case where they literally tried the fraud case. I spent half my time defending the fraud allegations in an ERISA case. We then had the actual fraud case before the jury for three weeks where we actually tried it. And I lost, which is part of my cross-appeal, I lost the damages on ERISA because I could not replicate the UCR in the allowed amounts of the plans. I couldn't replicate them because I didn't have the plans at the time. They would not provide their database and the information we had the plans, but they would not provide us with the database. So I could not replicate it. They claimed UCR, it's our discretion. And Judge Hoyt ruled against me on that. They then come in and get an expert witness who, instead of utilizing the best evidence, which is the database and the information they have to determine UCR, she goes out and does basically what I did to use national databases, to use 125% of Medicare, everything except what was in their database and what is their UCR. And Judge Hoyt ruled you can't use the UCR argument against Sutter and North Cyprus and beat him and then come out and go outside of the UCR amount and the database. You cannot do that. And you won the case that way. More importantly, Judge Hoyt ruled, you can't make millions and millions of dollars off of the savings that you make, which is a false savings, pursuant to the plans, and then go outside of the plans to determine what your damages are. And Judge Hoyt was not prejudiced against this expert witness. What was very clear is under Texas law, if you have a fraud claim, assuming it's not preempted, you have to determine the value received because every one of these claims was legitimate. Every single one. We're not some little ambulatory surgery center where somebody comes in, drinks some Kool-Aid for a few hours and walks out with a durable medical good and we bill for it. These were, by their own admission, legitimate goods and services. You have to determine what the value received versus the value paid, which their expert never did. She never determined what claims were within the four-year statute of limitations for fraud and which were outside of it. There were five months from January 1, 2009, through the 31st of May, 2009, that were clearly barred by the statute of limitations on thousands of claims. They were in her damage figures, and she never excluded that. And even if this is preempted by ERISA, which I'll mention in just a moment, it's a two-year analogous statute of limitations which this court has already ruled in North Cyprus v. CIGNA. And those claims were not even segregated. She did not segregate the ERISA plans from the non-ERISA plans. Remember, part of the three-week trial was to sue on non-ERISA plans. How's the jury going to know out of 600-plus plan sponsors which one are ERISA and which are not? She's got to do that. The other thing is she did not make a distinction between plans and policies, because with the policies, ADNA kept the money. It was their money. And under the plans, it was supposed to go back to the plan sponsors. And then finally, in this case, we spent half of our time of that three weeks trying ER fraud and observation cases, claims, that we put people through the ER fraudulently. They drop it on appeal, because their own SIU found after six years of investigation there is no ER fraud. Their own doctors who reviewed our documents said there is no ER fraud. So they just drop it. But did their expert witness drop those claims from her damages? No. They're sitting in there. And what her position was that we took advantage of their, what's the word, inefficient claims handling. Even though ADNA made a representation to their plan sponsors that they would be 99-plus percent accurate on claims. Now, with regard to the distributions, judges, I want you all to look at this carefully. Because what ADNA did was throw on the wall that the doctors made a lot of money, so therefore, Mr. Shealy even argued this, therefore, there has to be fraud. Look at page 45 of their brief of the seven exhibits that they claimed were excluded by Judge Hoyt. Five of them I put into evidence. They were e-mails and letters to the partners that I put on first and I put them in evidence. Judge Hoyt was not going to permit them to put it in and have the same document marked twice. There were only two left. One was exhibit A422, which was demonstrative evidence. Demonstrative evidence that counsel had put together claiming how much money the doctors had made. Of course that doesn't come in unless there's a stipulation. In my 38 years of trying cases, demonstrative evidence is never admitted unless the parties stipulate. The other one was a list of partners and what units they owned that didn't give any information whatsoever. With regard to these alleged kickbacks, there are 140 doctors. They never deposed any of them. Thousands of patients they didn't depose. They never tied together any alleged payment of a distribution which was determined by a CPA. And more importantly, the units that were owned by the doctors were issued in 2004, three years before the hospital opened. Nobody knew what was going to happen in 2007. They never connected one payment with any referral or any claim. None whatsoever. They had none. And Judge Hoyt also said, you never even put on evidence of what you would have paid but for this alleged fraud. Where is it? They didn't do it. And that's why Judge Hoyt came in and said, you know, I'm going to not let this in. Also, they had an expert witness up there opining on the Texas Insurance Code and on the plans telling the jury what we did wrong. That's where he said that she was not fair as an expert witness, and as a gatekeeper, it was appropriate. Now, having said all this, the question I know Judge Smith is probably thinking, why are we even having a jury trial on fraud? Aren't these 502A3 claims that Aetna made? And isn't the Supreme Court, which Justice Kennedy in the Go Bill vs. Liberty said, that you have to have state law claims that are entirely independent? Entirely independent of ERISA. What claim could they bring that was entirely independent? It was not. Everything was tied. If you want to look at what the coverage is, whether or not you're going to be paid, even to the UB04, you have to go to the plans. And it goes there. They have to, under the Go Bill vs. Liberty case, this case should have been preempted. Because the ASA, you have to go to the charges, you have to go to the exclusion, and you have to make a determination as to whether or not there's going to be coverage under the plan. This is not a case where you have the garden variety, as the courts say, fraud. For example, where the member comes up and lies about his age or lies about the fact that he's employed. That's the garden variety fraud that you have in an ERISA case. But the whole point of having uniformity in ERISA is not to have 50 states determine their own fraud and their own basis for fraud. There is no way that they could ever claim in this case that their claims are entirely independent from ERISA. They chose, Mr. Sheely stood up and said, we have chosen not to go forward with our ERISA because they want to get to the jury, but with no evidence. Their claim was an ERISA claim from start to finish, and the UB-04 claims forms were a part of the ERISA documents, and therefore ERISA should have preempted. Now, finally, very quickly with regard to my counterclaim. I had an ERISA 502A1B claim, and I could not prove the claim because I could not replicate the database. It's basically what the court said. I asked for those documents in discovery under Rule 26. I did not get them. They cited the Ellman case, which is 404, duty of law. You first said you wanted the database, and then you kind of backed off and said it wasn't really the database you were looking for. There was some inconsistency in what you said you wanted. Okay. No, what I'm saying is we did ask for the database and for the fee schedules, which is what we never got. I think I misspoke a moment ago with regard to plans. We did end up getting the plans in the litigation. We never had the plans before during the time of the claims. But under the Department of Labor ruling, we are entitled to those documents where we could have replicated our damages and met our burden of proof. Thank you. Okay. Thank you, Judge. We have time for a vote. Thank you, Judge Smith. Mr. Sutter started by saying that this is a heavily factual case, and we tend to agree that's what we think it belongs in front of a jury. He then proceeded to give you his version of what he thinks are the best and most helpful facts that he thinks he proved in front of the jury, coupled with the argument that he hopes he would get to give in front of a jury if we go back in front of a jury. But the fact is we had a story to tell a jury, too. For everything that he said, we had evidence that that was not so. He said that there were e-mails that we knew about the prompt pay discount. They kept telling us about a prompt pay discount. People based on regulatory guidance would understand that to be a 5% discount. People would not understand that the patient was told we will treat you as in-network pricing and the insurance company will be billed for out-of-network prices. People would not understand that instead of collecting $7,600, they would collect $1,200, and that they would do that 44,000 times. They can have a strategy in front of a jury if they think that would work in Texas of blaming the victim, even if the victim is an insurance company. Have at it, I say. But the fact is this is Rule 50, and we are entitled to go to a jury if we had evidence for our case, and we did. Now, he kept also bringing, as he did in his papers, this North Cyprus v. Cigna case. I continue to be mystified by the citation. It was a case brought under ERISA where the question in front of the court was the applicable statute of limitations and whether to borrow fraud or something else. Since Cigna was not claiming fraud, this court said fraud seems inept. How that would seem to have anything to do with this case still continues to elude me. He says that every claim was legitimate, and I think that is basically an echo of what the district court said in saying that the patients were really sick. We're not saying that this was a billing fraud in the sense that services were not provided. This is an overcharging case. And in saying that, he was saying that the expert was properly excluded because this is not one of those places where you go in and get durable medical equipment that you don't really get or whatever. I don't understand what the analogy was. But the fact is the expert took into account that the claim was legitimate in the same way that they took it into account. She started with their price, 125% of Medicare, and took that as the baseline for the value of the services rendered. And one of her models was, okay, we'll take you at your word. You wanted in-network pricing. That's what we should have paid because under our plans, we're not required to pay more than the obligation of the patient. You lure the patient in by saying 125% of Medicare. That's our obligation. Our obligation is not your rack rate if that's not how you got the patient in. Now, on the kickback question, he went through various of the exhibits. It sort of boggles the mind that he fought tooth and nail to keep all of this evidence of how they got all the doctors and the ownership interest just so that he could put all of the evidence in. We have an offer of proof that fully details our arguments. And, of course, part of the issue here is that the arguments were also precluded, and we want to be able to make them. On the question of fraud and preemption, it was never raised in their appeal, in their red brief. It was raised for the first time in their reply brief. It's wrong in its own merits. The courts of appeal that have considered whether this is an independent duty, there are two, Geller and Biondi. They have all concluded that fraud claims are not preempted under this federal statute. There are multiple district courts to the same effect. And this is consistent with the guidance from the Supreme Court in other areas, such as the Old Fair v. Good case from the Supreme Court, that there is always an independent duty to tell the truth. They didn't. We should tell that to a jury. Thank you very much. Thank you, Mr. Estrada. Your case is under submission, and the court is in recess until 9 o'clock tomorrow.